By the Court, Gridley, J.
This ease comes before the court on an appeal from a judgment entered on a report of referees. The claim of the plaintiff is founded on an indebtedness which accrued for supplies furnished for the Jefferson county poorhouse while the predecessors of the present defendants held the office of superintendents of the poor.. The defense relied on is, that the superintendents, as a corporation, or in the character of superintendents, never contracted the debt.
I. A question is made, whether an action can be maintained against the superintendents, as a corporation, for supplies furnished for the poor-house. Prior to the revised statutes it was decided in the eases of Gourlay v. Allen, (5 Cowen, 644,) and Flower v. Allen, (Id. 654,) that overseers of the poor were not liable upon an implied assumpsit, for articles furnished or services rendered for the paupers of their respective towns; that they could not make their towns the debtors for a demand not authorized by the order of a justice of the peace. In King v. Butler, (15 John. 281,) it was held that an overseer was personally liable on an express undertaldng to pay for the keeping of a pauper, without an order. *265 In Todd v. Birdsall, (1 Cowen, 260,) it was held that an overseer was liable on a contract made by his predecessor, which was within the scope of his authority and which ho had, therefore, a right to make. Thus the law stood when the revised statutes were enacted, and the 4th article of title 4, (2 R. S. 473,) entitled, “ Of proceedings by and against public bodies having certain corporate powers, and by and against the officers representing them,” became a law. By the first section of this article, (the 92d of the title,) it was provided that actions might be brought by a large number of officers, among which were county superin. tendents of the poor, upon any contract made with them or then predecessors, and to enforce any duty or liability enjoined by law, <fcc. By the 96th section, actions were given against the same officers named in the 92d section, and by the 97th section it was enacted that in actions against superintendents of the poor, or overseers of the poor, to enforce any liability of the county or town, the defendants should not be held to bail. By the 102d and 103d sections, no execution was to issue on such judgment, but a transcript of the judgment was to be laid before the supervisors of the county at their next meeting, and the amount thereof assessed like other taxes, and paid by the county treasurer.
These provisions, it will be readily seen, were intended to constitute a system for the enforcement of claims in certain cases, in relation to which the decisions had been fluctuating and inconsistent. It was the intention of the legislature, as appears by the notes of the revisers, (3 R. 757,) to enact the law as laid down in the case of Todd v. Birdsall, and to provide the way in which a judgment should be collected, short of taking it from the pocket of an innocent officer.
A note of the revisers to the 97th section, refers us to the 1st and 2d titles of the 20th chapter of the first part of the revised statutes,- for the cases in which actions are given against superintendents. This act “ for the relief and support of indigent persons,” prescribes the powers and duties of the superintendents of the poor. (1 R. S. 613.) By the 16th section they are declared to be a corporate body, whose duty it shall be to provide *266 suitable places for keeping the poor, where houses have not been erected for that purpose by the county; to establish prudential rules for the government of the paupers; to employ suitable keepers, officers and servants ; to purchase furniture, implements, and materials that shall be necessary for the maintenance of the poor; and to sell and dispose of the proceeds of their labor. These provisions, with several others contained in subsequent sections, clearly contemplate a power to make contracts and to provide for the performance of them. To meet these expenditures it is provided by the 50th section of the act, that the superintendents shall annually make an estimate of the sum necessary for the support of the poor, and present the same to the board of supervisors, whose duty it shall be to raise this sum by assessment, and pay it to the county treasurer, to be by him kept as a separate fund, distinct from the other funds of the county.
In the 3d section of title 4, chapter 13, (1 R. S. 386,) are enumerated what shall be deemed county charges; and in the 12th subdivision is found the following: “ The sums necessarily expended in each county in support of county poor-houses and indigent persons whose' support is chargeable to the county.” And by the 4th section of the same act it is provided, that “ accounts for county charges of any description, shall be presented to the board of supervisors of the county, to be audited by them.” Now who shall account for the sums expended in support of the county poor, but the superintendents who are charged with the duty of purchasing supplies and of hiring the laborers and servants for the poor-house 1 It is very clear to my mind that by comparing the two classes of enactments together, there is no statutory objection to the capacity of the superintendents to contract a liability for supplies for the county poor-house, which may be enforced by suit.
The law stood thus till 1832, when the revised statutes were amended by adopting the following provision: “ The superintendents of the poor shall audit and settle all accounts of overseers of the poor, justices of the peace, and all other persons, for services relating to the support, relief and transportation of *267 county paupers; and shall from time to time, draw on the county treasurer for the amount of the accounts which they shall audit and settle.” (Laws of 1832, p. 43, § 1. 1 R. S. 628, § 62.) These accounts must be made out in items, and verified by affidavit. ( Laws of 1847, p. 729, § 2.) Now this cause was argued as though the comprehensive terms employed by the legislature would embrace claims for labor and services in the poor-house, or appertaining to the county poor. I can not think such was the intention of the makers of the law. It may all refer to the services of the overseer and justice in a case where the pauper was too ill to be immediately removed. And the terms “all other persons,” would be satisfied by construing it to mean, persons who performed any services—as transporting, for instance— in relation to the same class of paupers. If this provision is to receive a broader interpretation—one that would embrace the claims of the laborers and servants at the poor-house—then there is no reason why the same enactment did not embrace the supplies for the county poor-house. It would leave the latter to be the subject of contract under the 16th section of the act before cited, (1 R. S. 613,) and the other to be audited and paid by the superintendents, by order on the treasurer. It is true that Judge Cowen intimated in 2 Hill, 45, that such a provision would not be inconsistent with the right to sue the superintendents for the same claim which they were bound to sit in judgment upon, and to satisfy, by an order on the treasurer. But that case was more than doubted by Bronson, J. in 6 Hill, 245, and is utterly inconsistent with the decision in Vedder v. The Superintendents of the Poor of Schenectady, (5 Deuio, 564.) The construction which I put upon the statute in question would leave the general words to be controlled and limited by the subject matter of the enactment. It would also prevent its operating to repeal so much of the other acts I have cited, as places services performed by the laborers and servants in the poor-house upon the same footing with the general supplies furnished for the paupers. There eértainly is no reason why the male and female servants who labor in the poor-house should be subject to one rule of compensation, and the merchant who supplies the provisions to *268 another. A construction which repeals another statute should be very clear. And especially is this remark true when the repeal is of a part of a statute, and it seriously mars the harmony of a system.
For these reasons, I am of the opinion that the provision contained in the act of 18B2 has no reference to services performed by the servants and laborers who are employed at the county poor-house. But it was asserted on the argument, and was not denied, that the practice had universally obtained, for the superintendents to audit the accounts for the labor and supplies for the poor-house, and to draw orders on the treasurer to pay them. The same practice seems to have prevailed elsewhere, from the history of the case of the Chemung Bank v. The Board of Supervisors of Chemung County, (5 Denio, 517.) The fund raised by virtue of the 50th section of the act for the relief of indigent persons, is regarded in practice as a distinct fund, separate from any personal or corporate liability of the superintendents, called the poor-house fund, against which the superintendents have been accustomed to draw, for the discharge of all claims arising out of the support of the poor at the county poor-house. This gives rise to the next question in the case, which is,
II. Whether it did not appear on the trial that the credit was given for the goods which constituted the plaintiff’s claim to the county of Jefferson, or to the Jefferson county poof-house ; in other words, to the fund instead of the superintendents’ personal or corporate liability. Whether the undertaking was not to rely on that fund, by receiving orders on the treasurer of the county, instead of any contract made with the superintendents in their corporate capacity. It was known to the plaintiff that the amount raised for the support of the county poor was deposited with the treasurer of the county, to be kept by him as a separate fund. (1 R. S. 627, & 50.) It was also known to him (for it was charged on the argument as the universal practice, and not denied,) that by a general custom, the large class of accounts for labor and supplies at the poor-house were audited and settled by the superintendents, and paid by orders on the treasurer of the county, to be satisfied out of this fund. Such knowl *269 edge is also to be inferred from the course of business in the case now under consideration. Now it is proved by Mr. Moody, clerk of the plaintiff, that these goods were charged on the plaintiff’s book to the “ Jefferson county poor-house.” So too, the order mentioned in folio 71, and signed by one of the superintendents, requests the plaintiff to “pay Stephen Turner 6s. a week for 4 weeks and charge the Jefferson county poor” When it is remembered that there was a.fund in the hands of the treasurer, known as the Jefferson county poor fund, on which the superintendents were accustomed to draw for such claims as that which forms the subject of this suit, it will be difficult to say that it was not the intention of both parties to look to the fund, instead of the superintendents, as the contracting parties. The order certainly pointed out this fund as the debtor, instead of the superintendents, either in their personal or corporate capacity. The goods were not charged to the superintendents, nor did the order authorize such a charge. The charge was made against the poor-house fund, which was perfectly well known to both parties, as well as the agency of the superintendents in giving a lien on it. Now if the credit was given to the fund, on the supposition that the goods would be paid for by a draft on the treasurer, then no action will lie against the superintendents till an application has been made for an order on the fund, and they have refused to give it.
The following cases will show how strict is the rule which holds parties bound to look to the persons or funds to which they have first given credit. In Leggat v. Reed, (1 Car. & Payne, 16; 11 Com. Law Rep. 801,) the suit was for work and labor in putting up a door at a house in Beaumont-street. The defense was that the defendant had nothing to do with the matter except to give an order on behalf of a Captain Earl, and it was proved that a bill had been sent in headed “ Captain Earl.” Parke, J. laid down the rule “ that if the plaintiff had ever given credit to Captain Earl, he could never shift his claim to charge the defendant.” He left it to the jury to say to whom credit was given, and they found for the defendant. In Taylor v. Brittan, mentioned in a note to this case, the plaintiff, a jeweler, sued for *270 a quantity of jewelry purchased by Mrs. Brittan. It appeared that when she bought the jewels she stated that she bought them for a friend in the West Indies, who would send the money for them as soon as received; to which the plaintiff assented. The bill delivered was headed “ Mrs. Brittan.” Garrow, B. ruled that though Mrs. B. was a feme covert, yet if the jeweler gave credit to her and the remittances she was to receive from the West Indies, the action could not be maintained against her husband. In Bentley v. Griffin, (5 Taunt. 356, 1 Com. Law Rep. 131,) a new trial was granted, on the ground that the evidence showed that the credit was given to the wife.
Now this was a question of fact for the referees, and they have found that the credit was given by the plaintiff to the fund, and not to the superintendents. Having once given credit to the fund, the plaintiff can not change the credit, until the superintendents have refused to give an order on the treasurer. We are all satisfied that the finding was right. The evidence justified the finding. It would be a violation of good faith to hold that this action would lie against the superintendents, when the evidence showed that it was contemplated by both parties that the plaintiff should look to the fund, and to an order on the treasurer, for his pay. When they have refused to give an order on the treasurer it will be in season to sue them for a breach of contract. But if the testimony was less strong than it is, being a question of fact settled by the referees, the court would not disturb their finding.
As to the ruling alledged to be erroneous, suppressing and striking out certain questions, with their answers, we think the plaintiff should not complain of it. The questions suppressed, and the answers to them, are before us ; and we think that whether suppressed or not, they would not change the character of the report. The nonsuit would be right, either way. The rule is the same as it would be on a case, on the verdict of a jury. Where the court can see that any error could not have injured the plaintiff who complains of it, no new trial will be granted for such error.
New trial denied, and judgment affirmed.